33636, 33637, 33638.   TROUP *v.* THE STATE..

DECIDED NOVEMBER 21, 1951.   REHEARING DENIED DECEMBER 12, 1951.

142

*L. J. Courson, Elsie Higgs Griner, McDonald & McDonald,* for plaintiff in error.

*Edward Parrish, Solicitor-General, J. P. Knight,* contra.

MacIntyre, P. J.   1. The only question raised and urged by counsel for the defendant in their brief on the general grounds is whether these transactions were cash transactions or credit

transactions; therefore it is unnecessary to lengthen the opinion by pointing out in detail the evidence in the record showing the sale of the livestock specified in the bill of indictment, that the livestock was disposed of by the defendant without having paid for same, that the Farmers' Livestock Auction Company Inc. sustained a loss by reason of these acts of the defendant, that the defendant was a person engaged in purchasing livestock from farmers and commission merchants on cash sale, and that the Farmers' Livestock Auction Company Inc. was and is a commission merchant, engaged in the sale of livestock.

In order to constitute a sale of any kind there must be an agreement upon certain essentials; and, in order to constitute a cash sale, it must be understood between the parties that the sale is to be for cash; the agreement may be either express or implied from the circumstances of the transaction whether there be a direct statement to that effect or whether it be inferred from all the circumstances of the transaction that the sale was a cash sale. *Hill v. Butler, Stevens & Co.*, 8 *Ga. App.* 669, 670 (70 S. E. 34). The auctioneer who conducted the public auction, at which there was competitive bidding, testified that the sales in question were for cash; that on the occasions referred to in the three indictments under consideration, the defendant bought "them [the livestock] at auction. He did buy in the ring in competition with other buyers. . . Yes, sir, he bid with the other cash buyers in the same manner as they did. The auctioneer is not authorized to accept any bid other than a cash bid." Mr. Perry, manager of the Farmers' Livestock Auction Company testified that he was working in the ring, the arena in which the livestock is displayed, at the times here in question and that the sales of the cattle in question on the occasions in question were strictly for cash by the auctioneer, and the jury was authorized to so find. Thus the only question as to the character of the sales is whether any subsequent stipulations or conditions changed the character of the sales from ones for cash to ones in which there entered as a part of the transactions, such an element of time as to make them credit sales instead of cash sales.

The jury was authorized to find that the defendant was the owner of a livestock auction business in Ocilla, Georgia, and

that he was also engaged in the business of buying livestock from farmers and commission merchants, and that he was thoroughly familiar with the manner and terms under which livestock auction sales were conducted, which is for cash; that the Farmers' Livestock Auction Company were commission merchants, located in Berrien County, Georgia, conducting auction sales of livestock on Tuesday of each week, and that this company had been operating for about two years during which time the defendant had been purchasing livestock at such auction sales conducted by this company; that the defendant was familiar with the fact that all these auction sales were conducted by the company on a cash basis, and that the auctioneers conducting these sales were not authorized to accept any but cash bids and were instructed not to accept credit bids; that it took some time after the completion of the bidding, frequently hours, for the auction company to make up the invoices for the purchases of the livestock sold; that for the convenience of some of the larger buyers, among whom was the defendant, those larger buyers were allowed to leave the sale at the completion of the bidding, let their truck drivers pick up the invoices and the livestock purchased, and those purchasers were permitted to mail the checks back to the livestock auction company in payment; and that these checks were usually mailed to, or received by, the Farmers' Livestock Auction Company, one, two, or three days after each Tuesday's sales, it being understood that the sale was a cash sale, but that the payment of the actual money was not to be made immediately upon the delivery of the physical possession of the livestock, but that the payment of the actual money was not to be delayed for any longer period of time than was necessary in the ordinary and usual course of business; that the defendant on March 21, 1951, at one of such auction sales purchased certain described livestock for the sum of $2976.61; that the physical possession of such livestock, together with the invoices therefor, was surrendered to the defendant on the same day, and a check for such livestock, dated the same day, was mailed back to the livestock company on the following day; that this check was dishonored; that on March 28, 1951, the defendant likewise at another of such auction sales purchased certain described livestock for the sum of

$5,458.03; that the physical possession of the livestock, together with the invoices therefor, was delivered to him on the same day and that a check was mailed back to the livestock company for such livestock on the following day, and this check was dishonored; that on April 4, 1951, at another such auction sale, the defendant purchased certain described livestock for the sum of $3,824.77, and the physical possession of the livestock, together with the invoices therefor, was surrendered to the defendant, but that the defendant mailed back no check, or at least the Farmers' Livestock Auction Company received no check, for this livestock; that all of the livestock purchased by the defendant on the three occasions in question had been disposed of prior to the finding of the three indictments; that this privilege of mailing the checks back was extended to the defendant for his own convenience in facilitating more accurate bookkeeping and in allowing the buyer, the defendant, to leave the sale immediately upon the completion of the bidding instead of waiting for hours until the invoices were made up and the livestock delivered to him; that by reason of these acts on the part of the defendant, the Farmers' Livestock Auction Company sustained the losses in the amounts alleged in the indictments.

Code, Ann. Supp., § 5-9914, under which the indictments were drawn, provides: "Any person engaged, either on his own account or for others, in the business of buying cotton, corn, rice, crude turpentine, spirits of turpentine, rosin, pitch, tar, cattle, hogs, sheep, goats, horses, pecans, peaches, apples, watermelons, cantaloupes, and mules, or other products or chattels sold by planters and commission merchants on cash sale, who shall buy such articles on sale from a planter or commission merchant for cash, *and shall fail or refuse to pay for, and shall make way with or dispose of the same before he shall have paid therefor,* shall be imprisoned in the penitentiary for not less than one year nor more than five years."

"The term 'on sale . . for cash' as stated in Code, § 5-9914, which makes it penal to fail or refuse to pay for agricultural products, 'is not confined to sales where the payment of actual money is to be made immediately, but includes all sales where it is expressly understood that the payment of actual money shall not be delayed for any longer period of time

than is necessary, in the ordinary and usual course of business.' *Skinner* v. *Hillis*, 25 *Ga. App.* 711 (104 S. E. 508)." *Cornell* v. *State*, 64 *Ga. App.* 202 (12 S. E. 2d, 378). As is also stated in the *Cornell* case: "The instant case may be comparable to a case of larceny after trust delegated. *Whitaker* v. *State*, 9 *Ga. App.* 213, 217 (70 S. E. 990). 'A crime or misdemeanor shall consist in a violation of a public law in the commission of which there shall be a union or joint operation of act and intention, or criminal negligence.' Code, § 26-201. While criminal intent is a necessary element in the commission of the crime charged in this indictment, yet the criminal intent in such connection is simply the intent to do the act which the legislature has prohibited. *Mitchell* v. *State*, 20 *Ga. App.* 778 (2) (93 S. E. 709). Where the cash is paid there is no occasion to invoke Code § 5-9914, under which the indictment here is drawn. The section is applicable only where the agreement to pay cash is not complied with by the buyer. If the sale was to be for cash, merely because the seller did not immediately receive the purchase price in actual money with the surrendering of the physical or derivative possession of the property, the statute could none the less be invoked even though it is expressly understood that the payment of the actual money shall not be delayed for any longer period of time than is necessary in the ordinary and usual course of business (*Skinner* v. *Hillis*, supra); otherwise, it seems to us that it would be hard to imagine a case in which the provisions of this section of the Code would be applicable. *Charleston & Western Carolina Ry. Co.* v. *Pope*, 122 *Ga.* 577, 579 (50 S. E. 374); *McCall* v. *Hunter*, 8 *Ga. App.* 612 (70 S. E. 59)."

We think the jury was authorized to find under the evidence that it was understood by both parties that the purchases of the livestock at such auction sales were for cash and while the physical possession of the livestock was to be delivered one day, and that, for the convenience of the defendant, the actual money was not to be paid immediately, but that it was understood that the payment of the actual money should not be delayed for any longer period of time than was necessary in the ordinary and usual course of business (*Cornell* v. *State*, supra); and, to find also that the seller (Farmers' Livestock Auction Company) was

not agreeing to deliver the livestock irrespective of payment of the actual money in the ordinary and usual course of business, as is generally understood between vendor and purchaser in the ordinary case of a sale on credit. Benjamin, *Sale of Goods,* p. 134. We think that the sales here in question in each of the three indictments were sales for cash, such as to come within the contemplation of Code § 5-9914.

There was some evidence concerning a check dated March 27, 1950, which was Monday, six days after the sale on March 21, in the amount of $4122, and that this check was subsequently paid by the defendant's bank, but the jury was authorized to find from the defendant's statement and from the evidence, that this check of March 27, 1950, was not given for any of the livestock purchased on March 21, but was given for the payment of another check that the Farmers' Livestock Auction Company held which had been given by the defendant to the company prior to March 21 and that prior check had been dishonored by the defendant's bank, and that check did not constitute a payment for any of the livestock purchased by the defendant on March 21, 1950; and, if the jury so found, this evidence would not change the situation with reference to the three transactions here in question.

There was also evidence that the defendant bought livestock at auction from Mr. Perry at a time when Mr. Perry was doing business for himself, and not as manager of the Farmers' Livestock Auction Company, and that later when he became manager of the Farmers' Livestock Auction Company, he sold "stuff" to the defendant nearly every week as manager of that company from the time he (Mr. Perry) started work for the company until the defendant failed to pay for the livestock purchased; that Mr. Perry had no authority to extend credit to purchasers at such sales made at auction for the company and that he did not to do so; but that he did allow the physical possession of the livestock to be surrendered to the defendant where it was understood that the payment of the actual money was not to be made immediately, but the payment of such actual money should not be delayed for any longer period of time than was necessary in the ordinary and usual course of business. There was evidence also that at one time, before the Farmers' Livestock

Auction Company opened up and Mr. Perry became its manager, the defendant owed Mr. Perry, individually, $15,000 to $20,000, when Mr. Perry was doing business for himself, which was a year or two before the Farmers' Livestock Auction Company opened up. Mr. Perry testified that that money was not "paid on the dot . . but that was a different situation from this [the situations alleged in the indictments]. He [the defendant] had turned his hogs over and they were wrecked and I knew as soon as he got the insurance money I would get my money. He did pay for them. It was the custom and had·been the custom with Mr. Troup ever since he bought anything from the Farmers' Livestock Auction Company that he would go to Ocilla and mail a check back. I would usually get the check back on Friday [after the Tuesday sale], I think, and sometimes it would be on Saturday. He did go home and mail them back. I wouldn't say that he did that on every transaction he ever had with me, but that was the usual way of doing business. I understood that was what he was going to do, go home and mail the check back." We do not think that this situation required the jury to find that the Farmers' Livestock Auction Company had sold the livestock referred to in the indictments on credit on the occasions referred to therein, nor did it require the jury to find a verdict of not guilty on· any of the three indictments.

The case of *Hill* v. *Butler, Stevens & Co.*, 8 *Ga. App.* 669, supra, is the only Georgia case cited by counsel for the defendant on the general grounds and we think that when this case is read in its entirety, it is authority for what is here decided, rather than authority for the contention of the defendant.

From what has been said, it follows that the evidence authorized each of the verdicts of guilty.

2. In special ground 1 of the motion for a new trial error is assigned upon the following charge of the court: "I charge you further in this connection, now, gentlemen, that the term 'cash sale' and 'for cash', as stated in the section of the Code that I have just read to you which makes it penal to fail or refuse to pay for agricultural products, is not confined to sale where the payment of actual money is to be made immediately, but includes all sales where it is expressly understood that the pay-

ment of actual money shall not be delayed for any longer period of time than is necessary in the ordinary and usual course of business." This portion of the charge is in the very language of this court in *Cornell* v. *State*, 64 *Ga. App.* 202, supra, and when considered in connection with the entire charge, no reversible error appears because of it. The failure of the court in its charge to include "implied understandings" in the definition of cash sales was more favorable than harmful to the defendant. This ground is not meritorious.

3. The following portion of the court's charge is material to a consideration of several of the following special grounds and in an effort to eliminate needless repetition, we shall set it out here and refer to it as the occasion arises: "Now, I charge you, gentlemen, in this case that any person engaged either on his own account or for others in the business of buying cotton, corn, rice, crude turpentine, spirits of turpentine, rosin, pitch, tar, cattle, hogs, sheep, goats, horses, pecans, peaches, apples, watermelons, cantaloupes, and mules, or other products or chattels sold by planters and commission merchants on cash sale, who shall buy such articles on sale from a planter or commission merchant for cash, and shall fail or refuse to pay for it, and shall make away with or dispose of the same before he shall have paid therefor, shall be imprisoned in the penitentiary for not less than one year nor more than five years.

"Now, gentlemen of the jury, I charge you further in this case that in order to convict the defendant it is necessary that the State prove, as I have said, beyond a reasonable doubt, that the defendant, as charged and alleged and set out in these indictments, did, as alleged and set 'out in the indictments, buy these cattle and hogs at a cash sale, and for cash; that he disposed of the cattle and hogs, and that he failed to pay therefor; and it is also necessary, gentlemen, for them to show that the cattle were delivered to him in Berrien County, Georgia, as alleged and set out in the bills of indictment.

"I charge you further, gentlemen, that in order to convict the defendant of buying cattle and hogs referred to in the indictments you must find that there was a sale; that the sale was for cash and not credit; and if you do find that the State has proved these facts beyond a reasonable doubt, then—I will withdraw

that part of it—and if you do not find that the State has proven these facts beyond a reasonable doubt then you should acquit the defendant.

"I charge you further, gentlemen of the jury, that under the laws of Georgia, a man cannot be prosecuted or convicted criminally merely because he owes a debt. However, gentlemen, I charge you in that connection that if he purchased this property such as described in the bills of indictment, and you find, gentlemen, that he bought it at a cash sale, and for cash, and that he disposed of it without paying for it, and you believe that beyond a reasonable doubt, then I charge you, gentlemen of the jury, that it would not be a credit transaction, but would be a cash transaction, and the defendant, if you believe that beyond a reasonable doubt, would be guilty of a felony as charged and set out in the bills of indictment.

"On the other hand, gentlemen, if you do not believe, as I said to you, that it was on a cash sale, and for cash, and you do not believe that he disposed of the property before he paid for the same, or if there is a reasonable doubt in your minds as to that, of course, it would be your duty to acquit the defendant.

"I charge you further in this connection, now, gentlemen, that the term 'cash sale' and 'for sale' as stated in the section of the Code that I have just read to you which makes it penal to fail or refuse to pay for agricultural products, is not confined to sales where the payment of actual money is to be made immediately but includes all sales where it is expressly understood that the payment of actual money shall not be delayed for any longer period of time than is necessary in the ordinary and usual course of business."

In special grounds 2 and 6 the following requests to charge were made and error is assigned upon the court's refusal to so charge: (Special ground 2) "I charge you in order to convict the defendant you must find that Farmers' Livestock Auction Company Inc. sold to the defendant the cattle and hogs referred to in the indictment with the understanding that the same would be paid for in cash at the time of delivery, and if you find there was any understanding or agreement that time would be given for defendant to pay for the same, then you should acquit the defendant and the form of your verdict would be, 'We, the jury, find the

defendant not guilty'." (Special ground 6) "I charge you that what is meant by a cash sale is a sale where it is understood and agreed that at the time of the delivery of articles that payment will be then and there made at the time of the delivery of the articles in question, and if there is an understanding or agreement that the articles will be delivered and will be paid for at a later date or at a subsequent time, then this would not be considered a cash sale, but would be a credit sale."

In *Cornell* v. *State,* supra, and in many other cases, this court has uniformly held that an understanding that the articles purchased would be paid for in cash at the time of the delivery was not necessary to make the sale a cash sale in the contemplation of the law. It follows, therefore, that since these requests to charge are not entirely correct statements of the law on the subject, the refusal of the trial court to give them in charge was not error. "Written requests to charge may be refused where they have been fully covered by the general charge, or where they are not pertinent to the case, or where they are not wholly correct in stating the law." *Loeb* v. *State,* 6 *Ga. App.* 23 (3) (64 S. E. 338). Special grounds 2 and 6 are without merit, as these requests to charge were not wholly correct in stating the law with regard to cash sales as embodied in Code § 5-9914, under which the defendant was indicted. *Alexander* v. *State,* 66 *Ga. App.* 708, 713 (6) (19 S. E. 2d, 353).

4. In special grounds 3, 4, and 5, error is assigned upon the court's refusal to give the following requests to charge: (Special ground 3) "I charge you, gentlemen of the jury, that if you find there was a sale of the cattle and hogs referred to in the indictment for which at the time said sale was made to the defendant credit was extended, then defendant would not be guilty of the crime charged in the indictment and you should acquit him." (Special ground 4) "I charge you that under the Constitution of Georgia a man can not be prosecuted for debt, and the failure of a defendant to pay a debt would not authorize his conviction even if it should be for any of the products referred to and described in the bill of indictment, and the gist of the offense under investigation is whether or not there was a cash sale and whether or not the defendant failed to pay, and disposed of the products without paying for the same after buying the same

for cash, before paying therefor." (Special Ground 5) "I charge you that by a cash sale is meant a sale for money in hand or one for ready money, as distinguished from one on credit."

The court's charge on the subjects contained in these requests has been set forth at the beginning of division 3 of this opinion. The court's charge, as shown by that quotation, is more specific in its application of the law (as embodied in Code § 5-9914, under which the defendant was indicted) and the evidence in the case than are the requests to charge. The court is not bound to charge in the exact language of a request, and a new trial will not be granted for refusing to charge as requested, when the charge given substantially covers the request. *Brown* v. *State,* 195 *Ga.* 430, 432 (24 S. E. 2d, 312), and citations. These grounds of the motion for a new trial disclose no reversible error.

5. In special ground 7, numbered VIII, error is assigned upon the following charge of the court: "I charge you further, gentlemen, that if you find the defendant guilty, you would have a right, in either or all of the cases, to recommend to the court that the defendant be punished as for a misdemeanor. If you find the defendant guilty and recommend that he be punished as for a misdemeanor, then the court would impose sentence on the defendant as for a misdemeanor. And if you find the defendant guilty and desire, gentlemen, to recommend that he be punished as for a misdemeanor, the form of that kind of verdict would be, 'We, the jury, find the defendant guilty, and fix his punishment at not less than (so many years) nor more than (so many years),' but simply add to your verdict, 'and we recommend that he be punished as for a misdemeanor.'" To this ground of the motion for a new trial the trial court added the following notation: "The recital of facts contained in the foregoing amendment to and of the original motion for a new trial is hereby approved as true and correct, with the following correction as to ground VIII of the amended motion: In addition to the facts set forth in said amended motion, the court certifies as follows: That immediately after the completion of the charge to the jury and the retirement of the jury to begin consideration of said case, the court of its own motion recalled the jury and

charged the jury in said case as follows: 'Gentlemen, I believe I failed to charge you in the event that you find the defendant guilty and recommend that he be punished as for a misdemeanor, that a misdemeanor punishment would be the punishment he would receive, unless the court saw fit to refuse to accept your recommendation. The court would have the right, in the event you recommended in these cases, or either of these cases, that the defendant be punished as for a misdemeanor—the court would have the right in the court's discretion to refuse to accept your recommendation. If the court should refuse to accept your recommendation for a misdemeanor punishment, then the period of time or years set out in your verdict would be the sentence that the defendant would receive. You may retire now.' " The error assigned on this ground is that these two instructions are in conflict.

"A proper instruction to the jury may cure an improper one, where the correct one explains away the defect in the improper one; but when two instructions, one proper and the other improper, are in direct conflict, a correct statement of the law in one does not cure the error in the other." Baltimore & Ohio Railroad Co. v. Morgan, 35 App. D. C. 195. "Although an excerpt from a charge standing alone might seem to give an erroneous rule, yet if, taken with its context, it is clear that the correct rule was given, and that the jury were not likely to have been misled, no new trial should be granted. Material error will cause a new trial; but substantial correctness, rather than mathematical accuracy, is required of the trial judge in instructing the jury." Sutton v. Ford, 144 Ga. 587, 591 (87 S. E. 799). If we concede the rule of law, that contradictory instructions raise a prima facie presumption of error, we do not think the principle applicable here. Doubtless the reason for the presumption is that the jury is confused rather than enlightened, and is as liable to follow the wrong instruction as the right one; but the instructions here do not seem to be contradictory. On the contrary, the last instruction instead of contradicting the first, was intended to explain the first, and the two should be read and considered together as virtually one instruction. Gray v. Washington Water Power Co., 30 Wash. 665 (71 Pac. 206); Lake Erie & W. R. Co. v. Douglas, 71 Ind. App. 567 (125 N. E.

154

474). "Instructions are considered as a series and it is not improper to refer in one instruction to another instruction in the charge." Reid's Branson, *Instructions to Juries*, Vol. I, p. 273, § 100. The two instructions here in question were not conflicting, as the latter instead of contradicting the former, merely explained it. There is no merit in this ground.

The trial court did not err in overruling the motions for new trials for any of the reasons assigned.

Pursuant to the act of the General Assembly approved March 8, 1945 (Ga. L. 1945, p. 232; Code, Ann. Supp., § 24-3501), requiring that the whole court consider any case in which one of the judges of a division dissents, this case was considered and decided by the court as a whole.

*Judgment affirmed. Sutton, C.J., and Worrill, J., concur. Gardner, J., concurs in the judgment. Felton and Townsend, JJ., dissent.*

TOWNSEND, J., dissenting. The evidence is undisputed that W. D. Perry, agent of Farmers' Livestock Auction Co. Inc. had formerly engaged in the business of selling livestock on his own behalf; that he sold to this defendant under much the same circumstances as he made the sales to the defendant now under consideration; that in this manner the defendant became indebted to W. D. Perry in the sum of $15,000 or $20,000, which sum was paid up prior to any of the transactions here under consideration; that on March 27, 1950, six days after the sale of March 21, the defendant paid by check in the sum of $4,122.90, which check was subsequently paid by the defendant's bank, for livestock which W. D. Perry, as agent of the Farmers' Livestock Auction Co. Inc. had sold to the defendant on March 7 and 14, fourteen and seven days respectively before the transaction involved in the first indictment, and for which payment was not made until thirteen or twenty days after the livestock was delivered to the defendant; that on March 21, 1950, at a time when the defendant was already indebted to the auction company in the sum of $4122.90, the sale involved in the first indictment in which the defendant incurred an additional indebtedness of $2976.61 was consummated, making a total indebtedness on this date of $7099.51; that the payment of March 27 reduced this indebtedness to $2976.61, but on March 28, the day following this pay-

ment, the sale involved in the second indictment was consummated, thus increasing the indebtedness to $8434.64; that this indebtedness remained due and unpaid until April 4, the date of the fourth transaction, which forms the basis of the third indictment, on which date the indebtedness was increased to $12,259.31; that on the dates of the consummation of each of the sales forming bases for the indictments under consideration invoices were furnished the defendant on the premises and at the times of the sales, and that there is no evidence of an express agreement between the parties that the sales were to be cash transactions. It follows, therefore, that in order to determine whether these sales were cash sales or credit sales the course of conduct of the parties resulting in the transactions here involved must be looked to in order to determine whether or not there was an implied agreement that the sales were to be cash sales, or whether such conduct implies sales for credit rather than cash.

A cash sale as contemplated under the provisions of Code § 5-9914, under which the indictments were drawn, is defined in *Cornell* v. *State*, 64 *Ga. App.* 202 (1) in which Gardner, J., dissented, and based on *Skinner* v. *Hillis*, 25 *Ga. App.* 711, as follows: " '[it] includes all sales where it is expressly understood that the payment of actual money shall not be delayed for any longer period of time than is necessary, in the ordinary and usual course of business.' " And in *Hill* v. *Butler, Stevens & Co.*, 8 *Ga. App.* 669, 672, it is held as follows: "It has several times been held that although time is required in order to procure the actual money in which the payment is to be made, the transaction would still be construed to be a cash sale, or a sale for cash, if this was the understanding of the parties; and on the other hand, if there was no understanding on the part of the parties as to the terms of the sale, the transaction has been held to be on credit, though only a brief time was to elapse between delivery and payment."

Since the rule laid down in the *Cornell* case is less favorable to the defendant than that in the *Hill* case, it will be treated here as the prevailing rule of law in this State with reference to the proper construction of Code § 5-9914, supra. So viewed, the evidence demands a finding that in the ordinary and usual course of business the livestock was invoiced on the premises at the time

of the consummation of the sale and before the removal of the property from the premises by the purchaser and thereupon immediately paid for by check by the purchaser. The evidence here also demands a finding that as to a few of the big purchasers, including the defendant, credit was extended, they being permitted to take the livestock together with the invoice therefor back to their places of business and within the next few days mail a check in payment thereof. Assuming that it was "expressly understood that the payment of actual money shall not be delayed for a longer period of time than is necessary in the ordinary and usual course of business", here there is nothing in the ordinary and usual course of business which would require waiting until a time subsequent to the delivery of the livestock to make payment by check, since here the purchaser was given an invoice before he left the premises with the livestock. There was nothing to keep him from writing a check before he left with the property, whereas in the *Cornell* case the purchaser was not informed and was not to be informed of the amount for which the check was to be written until the invoice could be prepared on the following day. To say that it was more convenient for the purchaser to wait until he took the livestock back to his place of business and thereafter within the next few days make remittance by check is another way of saying that he was credited for such period of time. When parties to a contract reach an understanding by the terms of which the transaction is to be consummated in a particular way and it is so handled and so consummated, then those facts determine whether it was a cash or a credit transaction. Parties cannot engage in credit transactions and change their nature merely by declaring that those transactions which obviously involve credit were not so considered by one of the parties thereto, and so sustain an unwarranted conclusion. To so pervert the meaning of the statute after credit has in fact been extended is to make it a vehicle of imprisonment for debt, which is expressly prohibited by our Constitution. Code § 5-9914 occupies a very important place in the economy of the farmers of this agricultural State. It prevents purchasers at cash sales from escaping with the property after giving bad checks or from slipping away with the property without making any gesture toward payment.

Planters and commission merchants by the exercise of reasonable diligence can employ this statute to protect themselves against purchasers seeking to cheat and defraud them. However, this statute was never intended to be used as a means of violating a sacred provision of the Bill of Rights of our Constitution, because however noble be the purport and intent of the Code section and however important it may be to planters and comission merchants of this State and to facilitating business transactions, it can never rise to equal importance with the provisions of the Bill of Rights of our Constitution, which is important not only to those in any specific occupation but to all people generally as a safeguard of our common liberties. The Bill of Rights has already too often been hurdled by judicial construction in this State in order to achieve what immediately appears to be a just or expedient result. The writer will go on further in this direction than he is already required to go by binding judicial precedent.

I am authorized to say that Felton, J., joins me in this dissent.

ON MOTION FOR REHEARING.

MACINTYRE, P. J. The defendant in one ground of his motion for a rehearing, relative to his contention that the evidence did not authorize the verdict, states that we have overlooked the testimony of witnesses on cross-examination and the inconsistencies and self-contradictions of certain witnesses. " 'A jury in arriving at a conclusion upon disputed issues of fact may believe a part of the testimony of a witness or witnesses, and reject another part theref, it being their duty to ascertain the truth of the case from the opinion they entertain of all the evidence submitted for their consideration.' (citing)—the jury could reject such testimony of these witnesses delivered under their cross-examination, and accept the testimony of such witnesses delivered under their direct examination, and could consider such testimony along with the circumstantial evidence, and if they did so, would be authorized to find the defendants guilty." *Peeler* v. *State*, 83 *Ga. App.* 102, 105 (62 S. E. 2d, 750). It seems to us that the defendant in his motion for a rehearing ignored or overlooked the rule that jurors are the sole judges of the credibility of witnesses, and that the jury may select what parts or part of the evidence they will in arriving at a conclusion upon disputed

issues of fact, even though that part of the evidence the jury may choose to believe is contradictory or inconsistent with other parts of the testimony of the same witnesses, and may make up their verdict accordingly. *Peeler* v. *State*, supra.

This and all other matters in the motion having been considered, the motion for rehearing is denied.

*Rehearing denied. Sutton, C. J., Gardner and Worrill, JJ., concur. Felton and Townsend, JJ., dissent.*